# EXHIBIT A

# 2377CV00350 Frudakis, Tony vs. Predictive Oncology

- Case Type:
- Torts
- Case Status:
- Open
- File Date
- 04/11/2023
- DCM Track:
- F - Fast Track
- Initiating Action:
- Other Tortious Action
- Status Date:
- 04/11/2023
- Case Judge:
- 
- Next Event:

**All Information | Party | Tickler | Docket | Disposition**

## Party Information

**Frudakis, Tony**
- Plaintiff

| Alias | Party Attorney |
|---|---|
|  | Attorney |
|  | Davis, Esq., John |
|  | Bar Code |
|  | 648399 |
|  | Address |
|  | Davis and Davis, P.C. |
|  | 352 Park St Suite 202 |
|  | North Reading, MA 01864 |
|  | Phone Number |
|  | (978)248-8750 |

More Party Information

**Predictive Oncology**
- Defendant

| Alias | Party Attorney |
|---|---|

More Party Information

## Ticklers

| Tickler | Start Date | Due Date | Days Due | Completed Date |
|---|---|---|---|---|
| Service | 04/11/2023 | 07/10/2023 | 90 |  |
| Answer | 04/11/2023 | 08/09/2023 | 120 |  |
| Rule 12/19/20 Served By | 04/11/2023 | 08/09/2023 | 120 |  |
| Rule 12/19/20 Filed By | 04/11/2023 | 09/08/2023 | 150 |  |
| Rule 12/19/20 Heard By | 04/11/2023 | 10/10/2023 | 182 |  |
| Rule 15 Served By | 04/11/2023 | 08/09/2023 | 120 |  |
| Rule 15 Filed By | 04/11/2023 | 09/08/2023 | 150 |  |
| Rule 15 Heard By | 04/11/2023 | 10/10/2023 | 182 |  |
| Discovery | 04/11/2023 | 02/05/2024 | 300 |  |
| Rule 56 Served By | 04/11/2023 | 03/06/2024 | 330 |  |
| Rule 56 Filed By | 04/11/2023 | 04/05/2024 | 360 |  |
| Final Pre-Trial Conference | 04/11/2023 | 08/05/2024 | 482 |  |

| Tickler | Start Date | Due Date | Days Due | Completed Date |
|---|---|---|---|---|
| Judgment | 04/11/2023 | 04/10/2025 | 730 | |

## Docket Information

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 04/11/2023 | Complaint electronically filed. | 1 | Image |
| 04/11/2023 | Civil action cover sheet filed. | 2 | Image |
| 04/12/2023 | Case assigned to:<br>DCM Track F - Fast Track was added on 04/12/2023 | | Image |

## Case Disposition

| Disposition | Date | Case Judge |
|---|---|---|
| Pending | | |

COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss.                                                                  SUPERIOR COURT DEPT.
                                                                            CIVIL ACTION NO.: _____

TONY FRUDAKIS,  )
    Plaintiff,  )
  )
  )                                                  4/11/2023
v.  )
  )
  )                                                  **RECEIVED**
PREDICTIVE ONCOLOGY  )
    Defendant  )
  )

## COMPLAINT AND JURY DEMAND

### Parties

1. The Plaintiff, Tony Frudakis ("Dr. Frudakis"), is an individual residing in Nahant, Essex County, Massachusetts.

2. The Defendant, Predictive Oncology ("the Company"), is a Minnesota-based company located at 2915 Commers Drive, Eagan, Dakota County, Minnesota.

### Facts

3. The Company is knowledge driven company focused on applying artificial intelligence (AI) to the research and development process of personalized cancer therapies.

4. Dr. Frudakis has worked as a molecular and computational biologist for over three decades.

5. Dr. Frudakis' expertise Molecular, Cell and Computational Biology. He is also well versed in Artificial Intelligence (AI) and Machine Learning (ML).

6. In May 2021, the Company offered, and Dr. Frudakis accepted, a full-time, salaried exempt Senior Scientist position at Tumorgenesis, a Company subsidiary. As part of the compensation package, the Company purchased Dr. Frudakis a laptop computer and agreed to compensate him for relocating from the west coast to Massachusetts.

7. Tumorgenesis was tasked with performing the R&D necessary to elevate POAI's product offerings, so that POAI could market these products to the scientific and pharmaceutical community to enhance the top line growth for the Company.

8. Tumorgenesis was a lean operation with only two other employees, both of whom are accomplished scientists with approximately 75 years of combined experience.

9. Dr. Frudakis' two colleagues were Richard Gabriel, who is in his 70's, and Paul Sweetnam who is in his 60's.

10. After starting, and based on his work product over his first year, Dr. Frudakis was recognized by his two Massachusetts-based peers, and many others in POAI, for his vision and work product, such as his intellectual authorship of novel single cell genomics methods and intellectual properties that POAI could use to enhance its product offerings. Some of this work resulted in a patent application filed on behalf of POAI outlining innovative single cell genomics-based precision pharmaceutical ideas, including but not limited to using single cell genomics defined biomarkers to assess chemosensitivity within heterogeneous tumors.

11. Based upon a combination of his work product and his contributions at a company-wide and consultant-assisted strategic meeting with Thrive Partnership Group, POAI management and Board of Directors (BOD) fully authorized and commited to and integrated the pursuit of Dr. Frudakis' single cell genomics ideas into the company's Strategic Plan, 2022 Goals and fiscal year budget, to be carried out at the Tumorgenesis lab. Tumorgenesis was instructed to focus on this work and told that the Single Cell Genomics budgetary item was the only R&D budgetary item Tumorgenesis was authorized to request purchase orders for or charge against. Tumorgeneis began charging R&D expenses against this budget category.

12. On information and belief, Dr. Arlette Uhelein obstructed and resisted this work throughout the next year, questioning the need for the lab in Salem, launching unfounded attacks on its scientific value to the Company, exhibiting constant lack of cooperation in the sharing of protocols such that it took multiple requests to receive, and refusing to request modification of the Helomics Investigational Review Board details so that samples and genetic material from samples in the Helomics inventory could be shared with Tumorgenesis.

13. Tumorgenesis was forced to find its own sample sources, which it did successfully, and all of Tumorgenesis R&D spending during 2022 was under the board-approved "Single Cell" budget category.

14. writing for poor performance or behavior, and in fact, in May 2022, Dr. Frudakis was given an eight percent (8%) pay raise, informed this was a larger than average pay raise

2

due to his performance for the Company, and given strong assurances regarding his job security, as expressed by then CEO Mel Engle and CFO Bob Myers as extending through 2024.

15. Dr. Frudakis made a drastic commitment to the Company by relinquishing co-ownership of his home in New Mexico to his ex-wife, and he purchased a home near the Tumorgenesis laboratory.

16. Based upon the pay raise and the Company's representations, Dr. Frudakis anticipated that his long-term tenure with the Company and financial recompense based upon his future contributions to the field of oncology through implementation of his ideas, would off-set the short-term financial losses.

17. In June 2022, POAI spent approximately $170,000.00 on a Tapestri instrument and accessory items for Tumorgenesis that would support the science introduced to the Company by Dr. Frudakis. Dr. Frudakis and Mr. Gabriel discussed several times, and Gabriel explicitly informed the CEO Engle and CFO Myers that this instrument could only be used for Single Cell Genomics work, and no other work.

18. One month later, the Company announced that it was abandoning the project, closing the Thermogenesis lab and separating from Dr. Frudakis, without offering him the opportunity to relocate within the Company at any subsidiaries.

19. On information and belief, the Company was concerned about the optics with investors based upon its decision to allocate an entire year of board-approved budget category funds to a project, culminating in the purchase of a $170,000.00 of equipment in June and then outrageously abandon the entire project a month later in July.

20. Helomics, a division of the Company acquired in 2018, serves as POAI's main laboratory.

21. On information and belief, Dr. Uhlein, who runs Helomics, is in her 50's.

22. On information and belief, Dr. Uhlein's lab is staffed with young employees primarily in their 20's and 30's.

23. Prior to 2020, during an extended time period in which Dr. Uhlein was in charge, Helomics repeatedly failed in its mission to forge a commercially viable clinical personalized medicine business based on assessing chemosensitivity to oncology standards of care.

24. On information and belief, accuracy levels of the Company test were approximately eight seven percent (87%). This contributed to questions being raised in the literature about

3

the value of Helomic's predictive testing, and Helomics lost a major government health institution as a payor and underwent numerous reorganizations and downsizings until Helomics and Dr. Uhlein somehow convinced POAI to acquire all of the shares of the company's lab in 2018.

25. By that time, Helomics had abandoned its purely clinical testing business model and through acquisition acquired an Artificial Intelligence (AI) software system. With this acquisition, Helomics and Dr. Uhlein/Helomics adopted a new business model as a drug discovery business for pharmaceutical company clients.

26. Dr. Uhlein claimed that Helomics, under her leadership, used innovative artificial intelligence to screen drugs against models of patient tumors, paving the way for POAI to claim it evolved into an innovative AI company. Dr. Uhlein's claim is somewhat disingenuous since she is using the same basic computational approach used by pharma companies for over decades, based on the Quantitative assessments of Structure Activity Relationships (QSAR), which Dr. Frudakis pointed out to her and others soon after he joined the Company.

27. Under Dr. Uhlein's leadership, there has been just one drug screen in the past two years that supposedly established the system and software functions as advertised; however, prior to the opening of Tumorgenesis, the work product was never independently validated or submitted for independent peer-reviewed publication and after the opening of Tumorgenesis, investors were told on a shareholder call that subsequent work product was "internally" (as opposed to independently) validated by the Company.

28. The slow demonstration of utility of this AI system at Helomics over the years, indicative of a pattern of Dr. Uhlein's failures at R&D, prompted the Company to launch Tumorgenesis as its R&D laboratory. Otherwise, R&D would have clearly remained Dr. Uhlein's domain at the Pittsburgh Helomics lab and there would have been no need to establish a separate laboratory in Salem, MA.

29. Tumorgenesis was tasked with performing the work that had not been done effectively at Helomics for years.

30. During its first year with Dr. Frudakis, Tumorgenesis succeeded in developing a system to capture much of the data from each patient tumor model that was missing with the over-simplified approach used at Helomics, which arguable led to Helomics' repeated business failures. This system was a combined 3D culture system and single cell genomics based assessment of drug response, such that all of the extant elements of tumoral heterogeneity could be monitored with precision and accuracy, enabling the development of a new generation of clonotype or cluster specific drug candidates that target specific genetic pathways.

4

31. Dr. Uhlein had recruited and hired a very young staff at the Pittsburg lab. Indeed, there is a noticeable absence of older, seasoned employees. In addition, Dr. Uhlein did not have a R&D background, or a history of true R&D (as opposed to the translation and implementation of R&D products produced by others) in her laboratory, and holds an MD not a PhD (research) degree.

32. Dr. Uhlein opposed the BOD's decision to launch Tumorgenesis and integrate single cell genomics into the Tumorgenesis R&D plan, because it represented a threat to her dominion over the science in the company, and on information and belief, her professional/promotional aspirations.

33. POAI had previously established a DEI initiative to shape representation on its BOD, thus ensuring that important decisions, including but not limited to hiring and promotional decisions, were not based upon merit but other factors, including gender and age.

34. Pamela Bush, who is connected to members of the POAI's BOD, and former Helomics managers/employees, was subsequently hired to direct business development efforts at POAI as a Sr. VP.

35. On information and belief, Dr. Bush was not hired because she was the best candidate based upon her skill set and acumen. The decision to hire Dr. Bush was influenced by the Company's DEI initiatives.

36. As part of the implementation of his general single cell genomics based ideas for helping the Company improve its product offering, Dr. Frudakis was invited to present an intellectual property he had previously developed for reducing the cost of single cell genomics analysis to affordable levels for high-volume testing. This IP is distinct from the single cell software IP Dr. Frudakis developed as a POAI employee, and represented a unique method for multiplexing DNA-based single cell genomics experiments so that expensive reagents could be divided over large numbers of samples, effectively reducing the per-sample testing costs.

37. POAI had originally expressed interest in licensing this IP from Dr. Frudakis so that it could be added to the Tumorgenesis workplan and help distinguish POAI from its competitors. Dr. Frudakis was informed that the CEO and CFO were in favor and the deal was impending.

38. During Dr. Frudakis' presentation of his IP, after single cell genomics had been integrated into the POAI goals and budget, and after diligence on Frudakis' IP had begun and produced positive feedback, POAI began looking at a company named zPredicta as an acquisition target.

5

39. Based in large part on Dr. Uhlein's advocacy, and against the recommendations of Dr. Frudakis and Dr. Sweetnam, the Company purchased zPredicta, a 3D tissue modeling company, founded and led by Julia Kirschner, a young woman apparently in her 40's.

40. As a result of the acquisition, Dr. Kirschner became a POAI Sr. VP. Dr. Kirschner's laboratory, like Dr. Uhlein's, is comprised entirely of youthful staff in their 20s and 30s.

41. In the beginning of Dr. Frudakis' tenure, Dr. Uhlein expressed support for his single cell genomics ideas and plans, both verbally in meetings and in emails. But after Dr. Bush and Dr. Kirschner were hired, Dr. Uhlein took the opposite tone, expressing, ostensibly, her adamant opposition to it.

42. On information and belief, Dr. Uhlein partnered with Dr. Bush to shrewdly and furtively pressure the CEO (Mel Engle) and the CFO (Bob Myers), both older white men, to recognize the need to 'catch up with the times' by incorporating DEI initiatives into personnel decisions.

43. Dr. Uhlein, Dr. Bush and Dr. Kirschner were obligated to objectively evaluate Dr. Frudakis' IP and single cell ideas during separate zoom calls, but instead they lodged meritless criticisms. Dr. Frudakis debunked these criticisms.

44. It was evident to Dr. Frudakis from those interactions that the three female executives lacked appropriate experience with single cell genomics, the molecular/genomic nature of the heterogeneity within the tumors Helomics had been modeling.

45. Dr. Frudakis recognized that these three individuals did not have adequate computational biology abilities, or sufficient 'hands-on' experience analyzing single cell genomics data sets. Therefore these three individuals were not in a position to judge or evaluate the utility of Dr. Frudakis' technology or single cell genomics in general as applied to POAI's product offerings.

Though their arguments were debunked (and not countered with new or effective arguments), the three announced their opposition not only to Frudakis' IP but to any single cell genomics utilization by POAI at all, and proceeded to convince POAI to reverse course on Dr. Frudakis' single cell genomics technology, single cell genomics in general, single cell genomics applied to POAI product offerings, and the general value of Tumorgenesis, which was working on not only single cell genomics but 3D tumor modeling as well (which unlike the z-Predicta technology, was scalable for high-volume requirements of high throughput drug screening). Their actions lacked good faith.

6

46. During the process of rejection, upon hearing that Dr. Uhlein and Mr. Myers were unexpectedly opposed to single cell genomics in general, and Frudakis' ideas specifically, Dr. Sweetnam, the intellectual author of the 3D tumor modeling approach at Tumorgenesis, and a seasoned pharmaceutical executive with over 40 years of experience and four (4) FDA-approved drugs under his professional 'belt' promptly resigned in protest.

47. As a result of the recommendation by Dr. Uhlein, Dr. Bush and Dr. Kirschner, the Company opted to reject Dr. Frudakis' IP single cell genomics as a means by which to improve the Company's product offerings, and was reversing course on the integration of single cell genomics into the POAI goals and budget, and was going to close the entirety of the Tumorgenesis lab/office in Salem, MA, resulting in the separation of Dr. Frudakis and Mr. Gabriel.

48. The Company asked Mr. Gabriel to dispose of the single cell genomics equipment it had just a month earlier purchased for $170,000, and indicated that Dr. Frudakis' patent on single cell genomics algorithms would be abandoned.

49. Dr. Kirschner then promptly quit or gave notice to quit the company, after the company had only a couple months earlier paid $10 Million ($10,000,000.00) in cash for her company, leaving management with a proverbial 'black eye' to explain to shareholders.

50. POAI announced in a July 27th 8-K report to shareholders that it planned to consolidate its budget and absorb the single cell genomics equipment it had just purchased a month earlier in Dr. Uhlein's Pittsburgh lab.  POAI spun the sudden reversal of course and strategy to its investors and the public as a consolidation and strategic decision aimed at saving the Company money

51. POAI announced in a July 27th 8-K report that it planned to consolidate its budget and absorb the single cell genomics equipment it had just purchased a month earlier in Dr. Uhlein's Pittsburgh lab.

52. The July 27th 8-K Report announced that Dr. Kirshner was appointed Chief Scientific Officer, earning $380,000.00, plus eligibility for bonuses, and a 'golden parachute' provision.

53. The 'AI' in POAI stands for artificial intelligence.

54. On information and belief, Dr. Kirschner has no direct or relevant AI experience.  Nor does she have any programming experience.  Like Dr. Uhlein, Dr. Kirschner ran a lab that was almost or entirely comprised of youthful employees and technicians.

7

55. In contrast, Dr. Frudakis writes AI programs and has even submitted a patent based upon his work product, which included AI software. He has decades of AI experience, and a larger number of years of molecular and cell biology experience than Dr. Kirschner, and unlike Dr. Kirschner, has had prior experience as an executive (both CEO and CSO) within a publicly traded company.

56. Based upon the qualifications for the Chief Scientific Officer position, an objective side-by-side comparison reveals that Dr. Frudakis was more qualified.

57. The Company did not even grant Dr. Frudakis the opportunity to interview for the Chief Scientific Officer position.

58. On information and belief, Dr. Uhlein and Dr. Kirschner took over control of the entirety of the POAI R&D decision-making process and budget. Dr. Bush, who worked remotely from home most of the time and was often unavailable during traditional work hours, would soon be appointed Chief Business Officer at an exorbitant salary even though the Company's low level of revenued had not increased after she was hired.

59. On information and belief, POAI misled its investors and the public about the need for such a strategic decision because the Company is well capitalized and is not under capital stress.

60. Weeks after the announcement that Tumorgenesis would be shut down, and Dr. Frudakis laid off, Dr. Kirschner claimed that she was never opposed to single cell genomics, which was a false statement contrary to emails and verbal statements already outlined as used to justify the closure of Tumorgenesis and the laying off of Dr. Frudakis.

61. Dr. Uhlein along with Dr. Bush and Dr. Kirschner successfully implemented a campaign to convince the current leadership to eliminate the 'competition', the older and more experienced employees, which included Dr. Frudakis, while retaining and embracing their ideas and work and dividing the saved salary amongst themselves vis-à-vis pay raises and other financial perks.

62. On information and belief, Dr. Uhlein has long-term plans to leverage the patent that Dr. Frudakis filed before joining POAI, as well as his ideas about targeting clonotypes with precision drug candidates.

63. In fact, all of the valuable ideas proposed by Tumorgenesis – the incorporation of 3D culture technology (which Dr. Uhlein originally resisted), and integration of single cell genomics (which Dr. Uhlein also resisted), was eventually embraced by POAI and integrated into the youthful labs run by Dr. Uhlein in Pittsburgh and Dr. Kirschner in California. Yet, the intellectual authors of these improvements at Tumorgenesis - the

three people that introduced the ideas to the Company - older white males in their 60's and 70's, were purged and their laboratory shuttered. As a result, there was nobody remaining with the technical or scientific expertise needed to critically evaluate the plans of Dr. Uhlein, Dr. Bush and Dr. Kirschner as they promote their own interests as they ascend through the hierarchy.

64. Dr. Uhlein, Dr. Bush and Dr. Kirschner's exercise in advising the Company was therefore a furtive charade, not to help the Company settle on a proper science and business course, but to eliminate older, seasoned (and possibly male) peers, who they regarded as competition for their aspirations of command and control over the Company.

65. On information and belief, the older male who is in charge of the Soluable laboratory in Alabama has expressed concern that Dr. Uhlein, Dr. Bush and Dr. Kirschner would have targeted him but for Dr. Frudakis bringing this lawsuit to expose the Company's discriminatory practices.

66. Shortly after Dr. Frudakis filed this lawsuit, and soon after being awarded the CSO position, Dr. Kirshner evidently pulled the proverbial cord on her newly awarded 'golden parachute' and separated from the Company, verifying Dr. Frudakis' claim that the Company did not make a decision based upon merit.

67. Raymond Vennare, a board member connected to Dr. Bush and Dr. Uhlein, became the new CEO. On information and belief, he sits on the board of another small biotech Company based in South Florida.

68. The Company did not offer Dr. Frudakis the opportunity to transfer to Dr. Uhlein's team in Pittsburg (Helomics) or to the Company's laboratory in Alabama (Soluble), or to the Company's laboratory in California (zPredicta). Dr. Frudakis would have been one of the most experienced – if not the most experienced and capable employees on the team.

69. On information and belief, approximately a month after Dr. Frudakis was separated from the Company without offered any transfer opportunities, Dr. Uhlein's lab in Pittsburg advertised for a new role performing 3D culture/model translation and development. Dr. Frudakis is more than qualified considering that he has a PhD in Molecular and Cell Biology.

70. Dr. Frudakis applied for the position. He was not granted an interview.

71. Recently, the Company has announced an alliance between another South Florida-based Company on which Mr. Venarre is a Board member. On information and belief, this may be the first step in a process of bringing that Florida company together with Predictive Oncology.

9

72. The Plaintiff exhausted his administrative remedies by filing at the MCAD.

## CAUSES OF ACTION

### First Cause of Action – Violation of M.G.L. c. 151B, § 1, et. seq.

73. The Plaintiff incorporates all prior paragraphs as if fully stated herein.

74. This is a cause of action by the Plaintiff against the Defendant for discriminating against him because of his age and gender.

75. The Plaintiff brings his gender discrimination claim based upon a disparate treatment theory as well as a disparate impact theory.

76. The Defendants made sex-based business and policy decisions that were based upon public sentiment, optics, DEI initiatives and political correctness instead of making merit-based business decisions unrelated to gender and age.

77. These decisions had a disparate impact on the Plaintiff, and as a result, the Plaintiff has suffered damages.

### Second Cause of Action – Breach of the Covenant of Good Faith and Fair Dealing

78. The Plaintiff incorporates all prior paragraphs as if fully stated herein.

79. Dr. Uhlein convinced the BOD to terminate the Plaintiff, thus paving the way for her to financially capitalize on Dr. Frudakis' patent.

80. As a result, the Plaintiff has been damaged.

## Prayers for Relief

WHEREFORE, the Plaintiff, Tony Frudakis, prays that this Honorable Court:

I. Enter judgment against the Defendants on all counts;

II. Enter an award of damages, reasonable attorney's fees, costs and pre-judgment interest against the Defendants, and

III. Grant such other relief as this Court deems just and proper.

*The Plaintiff demands a jury trial on all triable issues.*

DATED: April 11, 2023

                                              Respectfully submitted,
                                              The Plaintiff, Tony Frudakis,
                                              By his attorneys,

                                              John W. Davis (BBO #648399)
                                              Davis & Davis, P.C.
                                              352 Park Street
                                              North Reading, MA 01864
                                              (978) 248-8750
                                              jdavis@davisanddavispc.com

# CIVIL ACTION COVER SHEET

**DOCKET NUMBER**

**Trial Court of Massachusetts
The Superior Court**

| | |
|---|---|
| PLAINTIFF(S): Tony Frudakis | COUNTY 2 Essex |
| ADDRESS: 167 Wilson Road, Nahant, MA 01908 | |
| | DEFENDANT(S): Predictive Oncology |
| ATTORNEY: John W. Davis | |
| ADDRESS: 352 Park Street, Suite 202 North Reading, MA 01864 | ADDRESS: 2915 Commers Drive, Eagan, MN 55121 |
| BBO: 648399 | 4/11/2023 RECEIVED |

## TYPE OF ACTION AND TRACK DESIGNATION (see reverse side)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| B99 | Other Tortious Action | F | ☐ YES ☒ NO |

*If "Other" please describe:

Is there a claim under G.L. c. 93A?  ☐ YES  ☒ NO

Is this a class action under Mass. R. Civ. P. 23?  ☐ YES  ☒ NO

### STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff's counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

**TORT CLAIMS**
(attach additional sheets as necessary)

A. Documented medical expenses to date:
   1. Total hospital expenses ................................................... $
   2. Total doctor expenses ..................................................... $
   3. Total chiropractic expenses ........................................... $
   4. Total physical therapy expenses .................................. $
   5. Total other expenses (describe below) ........................ $
      Subtotal (A): $

B. Documented lost wages and compensation to date ............... $
C. Documented property damages to date ................................. $
D. Reasonably anticipated future medical and hospital expenses ... $
E. Reasonably anticipated lost wages ....................................... $
F. Other documented items of damages (describe below) .......... $

G. Briefly describe plaintiff's injury, including the nature and extent of injury:

**TOTAL (A-F): $ 500,000.00**

**CONTRACT CLAIMS**
(attach additional sheets as necessary)

☐ This action includes a claim involving collection of a debt incurred pursuant to a revolving credit agreement. Mass. R. Civ. P. 8.1(a).
Provide a detailed description of claim(s):

**TOTAL: $**

Signature of Attorney/ Unrepresented Plaintiff: X _/s/_   Date: 4/11/23

**RELATED ACTIONS:** Please provide the case number, case name, and county of any related actions pending in the Superior Court.

N/A

### CERTIFICATION PURSUANT TO SJC RULE 1:18

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

Signature of Attorney of Record: X _/s/_   Date: 4/11/23

| CIVIL TRACKING ORDER<br>(STANDING ORDER 1- 88) | DOCKET NUMBER<br>2377CV00350 | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|
| CASE NAME:<br>Tony Frudakis vs. Predictive Oncology | | Thomas H. Driscoll, Jr., Clerk of Courts<br>Essex County |
| TO: File Copy | | COURT NAME & ADDRESS<br>Essex County Superior Court - Newburyport<br>145 High Street<br>Newburyport, MA 01950 |

## TRACKING ORDER - F - Fast Track

You are hereby notified that this case is on the track referenced above as per Superior Court Standing Order 1-88. The order requires that the various stages of litigation described below must be completed not later than the deadlines indicated.

### STAGES OF LITIGATION                                    DEADLINE

| | SERVED BY | FILED BY | HEARD BY |
|---|---|---|---|
| Service of process made and return filed with the Court | | 07/10/2023 | |
| Response to the complaint filed (also see MRCP 12) | | 08/09/2023 | |
| All motions under MRCP 12, 19, and 20 | 08/09/2023 | 09/08/2023 | 10/10/2023 |
| All motions under MRCP 15 | 08/09/2023 | 09/08/2023 | 10/10/2023 |
| All discovery requests and depositions served and non-expert depositions completed | 02/05/2024 | | |
| All motions under MRCP 56 | 03/06/2024 | 04/05/2024 | |
| Final pre-trial conference held and/or firm trial date set | | | 08/05/2024 |
| Case shall be resolved and judgment shall issue by | | | 04/10/2025 |

The final pre-trial deadline is <u>not the scheduled date of the conference</u>. You will be notified of that date at a later time.

Counsel for plaintiff must serve this tracking order on defendant before the deadline for filing return of service.

This case is assigned to

| DATE ISSUED | ASSISTANT CLERK | PHONE |
|---|---|---|
| 04/12/2023 | **Anne Mitchell** | (978)462-4474 |

Date/Time Printed: 04-12-2023 08:51:32                                         SCV0261 08/2018